[Cite as *Beard v. Nationwide Ins. Co*, 2011-Ohio-2309.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MIAMI   COUNTY

| | | |
|---|---|---|
| RICHARD C. BEARD | : | |
| | : | Appellate Case No. 2010-CA-31 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2008-CV-1093 |
| v. | : | |
| | : | |
| NATIONWIDE INSURANCE COMPANY | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 13th day of May, 2011.

. . . . . . . . . . .

ALFRED J. WEISBROD, Atty. Reg. 0031240, Weisbrod Law Office, Post Office Box 513, Dayton, OH 45409-0513
        Attorney for Plaintiff-Appellant

JAMES P. SCHUCK, Atty. Reg. #0072356, and SOMMER L. SHEELY, Atty. Reg. #0076071, Bricker & Eckler LLP, 100 South Third Street, Columbus, OH 43215
and
ROBERT J. THUMANN, Atty. Reg. #0074975, Bricker & Eckler LLP, 9277 Centre Pointe Drive, Suite 100, West Chester, OH 45069

        Attorneys for Defendant-Appellee

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Plaintiff-appellant Richard C. Beard appeals from a summary judgment rendered in favor of defendant-appellee Nationwide Insurance Company. Beard contends that there are two genuine issues of material fact precluding summary judgment. Those issues are, according to Beard: (1) that the agency agreement between the parties is ambiguous concerning the scope of notice required, and whether cause is needed, for cancellation; and; (2) that Nationwide wrongfully deducted and confiscated monies from Beard's commissions, extended earnings, and retirement plan.

{¶ 2} We conclude that the trial court partially erred in rendering summary judgment. The record demonstrates that there is no genuine issue of material fact regarding the cancellation of the contract. But there are genuine issues of material fact regarding whether Nationwide failed to properly credit Beard with commissions that he earned. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

I

{¶ 3} In 1993, Beard entered into an agreement with Nationwide to become an independent contractor, meaning that Beard would own his own insurance agency, and would not be a Nationwide employee. Beard admitted in his deposition that he had ample time to ask questions regarding the terms when the agreement was signed. The agreement, entitled "Agent's Agreement," detailed the expectations of both parties, including payment plans and a termination clause.

{¶ 4} Under the agreement, Beard was to be compensated through commissions earned on sales and, after the agreement's cancellation, would receive "extended earnings"

from Nationwide, based upon his commissions during the last twelve months preceding cancellation. Beard would have the responsibility of setting up an office and keeping track of customer's accounts. Beard's responsibilities also included taking, and keeping track of, payments from his customers and placing the payments in an account (remittance account) separate from his business account, which Nationwide could access to withdraw those payments and apply them to the account of the policy-holder. Nationwide would receive payment records (remittance reports) from Beard each day, take the money out of the remittance account, and credit the customer's accounts.

{¶ 5} At some point in early 2007, Nationwide began to have problems withdrawing the correct funds from Beard's payment account. Nationwide would attempt to withdraw premiums from the account, only to discover that there were insufficient funds in the account. This led to overdraft fees being charged to the account. It was later determined that the account was being used for some of Beard's office expenses, including sponsoring a little league baseball team. An audit report was run in August 2008. The audit showed that Beard had failed to release remittance reports daily to Nationwide, that one of Beard's remittance accounts had a negative balance of $16,893.16 on the June 30, 2008 statement, and that Beard had written checks for office expenses from the remittance accounts. The bank account used for Beard's primary office in Piqua, Ohio, also showed $4,773 in NSF overdraft fees over a three-month period.

{¶ 6} Following the August 2008 audit report, Beard started to receive regular reminders from Nationwide and from Beard's Sales Manager, Steve Watters, concerning unreleased remittance reports. By failing to release the remittance reports, Beard prevented

Nationwide from properly crediting customer's accounts.

{¶ 7} As a result of the mismanagement of the remittance accounts and a complaint from a customer who had paid for coverage on rental properties, but had not received it, Beard's Agency Agreement was cancelled in mid-December 2008. The Agency Agreement states in Paragraph 9 as follows:

{¶ 8} *"Cancellation.* This Agreement shall be in force until canceled by either party.

{¶ 9} "This Agreement shall automatically cancel upon the date your license to act as an agent for the Companies is revoked or canceled, or upon death. Further, due to the personal nature of our relationship[,] you or the Companies have the right to cancel this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address."

{¶ 10} Nationwide sent a cancellation letter to Beard's last-known address, and also had the letter personally handed to Beard by Watters on December 15, 2008. The cancellation letter recited that the agreement was being terminated for violation of sections 5 and 7, but also noted that termination could take place with or without cause.

{¶ 11} There is no dispute that paychecks issued to Beard on November 26, 2008, December 15, 2008, and December 31, 2008, contain deductions for an item labeled "Underremit." The deducted amounts, respectively, are: (1) $11,320.78; (2) $2,700; and $60. These amounts include $14,060.78 in failed sweeps for Allied Insurance, one of Nationwide's companies, between June and November 2008. See September 28, 2009 Affidavit of Shawn Patterson, attached to Nationwide's Reply in Support of Summary

Judgment, and Exhibits A and B attached to Patterson's Affidavit.

{¶ 12} After Beard's agreement was cancelled, Nationwide received more than 100 complaints from customers who had paid their premiums directly to Beard between December 15 and 28, 2008, but had not received a payment credit on their accounts. These shortages totaled $17,729.87. See September 2, 2009 Affidavit of Shawn Patterson, ¶ 13, and Exhibit E attached to the Patterson Affidavit. In addition, Nationwide discovered other unremitted premiums, to Titan Insurance, another Nationwide subsidiary, in the amount of $1,164.04. Finally, Nationwide had to reimburse a policy holder, identified as Mark S., $597.00 for a premium that had never been sent to Nationwide. See Affidavit of Shawn Patterson, and Exhibits C and D attached to Nationwide's Reply in Support of Summary Judgment. The total of all the amounts deducted, both before and after termination, is $33,551.69.

{¶ 13} In addition to commissions on premiums, Beard received compensation in the form of extended earnings and deferred compensation. The Agency Agreement provides in Paragraph 11(a) for computation of Deferred Compensation Incentive Credits (DCIC), which range from 0% to 15% in any given calendar year, based on the agent's original and renewal earnings during that year. These amounts are credited to the agent's account until age 65. Paragraph 11(b) also provides for payment of extended earnings upon cancellation of the agreement. These earnings are to be equal to the renewal service fees paid to the agent for the last full twelve calendar months immediately preceding the cancellation, subject to certain exceptions that are not pertinent to this appeal. Upon cancellation of the agreement, extended earnings are paid. DCIC is also paid, under a formula based on the age and service length set out in Paragraph 11(c).

{¶ 14} Under section 6 of the Agent's Agreement, Nationwide had a first lien upon any compensation due to Beard for any payments Beard owed Nationwide. Due to the deficit in payments from Beard, Nationwide withheld a total of $19, 490.91 from Beard's extended earning payments to cover the amounts discovered to be due after the agreement was cancelled. The amounts withheld consisted of $1801.16 monthly for ten months (March 2009 through December 2009), and a final payment of $1,489.31 in January 2010.

{¶ 15} During his employment as an agent, Beard had also obtained loans from Nationwide Federal Credit Union (NFCU) to cover the purchase of two books (the rights to service accounts) from other agents. The loan agreements were for 75% of the commissions for one year earned on the books. At the time of the cancellation, these loans had yet to be fully repaid.

{¶ 16} After the termination of his agency contract, Beard sued Nationwide for breach of contract, alleging that Nationwide was not entitled to the funds that had been recouped from Beard's accounts. Beard also asserted that the cancellation clause requiring "notice" was ambiguous and that the agreement should be construed to require Nationwide to have good cause for cancellation.

{¶ 17} Nationwide moved for summary judgment on Beard's complaint. In support of its motion, Nationwide provided the trial court with records of Beard's failure to report remittance payments, the agreement signed by Beard, affidavits, and the termination letter putting Beard on notice. Beard's opposing memorandum was supported by his own affidavit and some documents. The trial court concluded that there was no genuine issue of material fact, and rendered summary judgment in favor of Nationwide. From the judgment rendered

against him, Beard appeals.

II

{¶ 18} Beard's sole assignment of error is as follows:

{¶ 19} "THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF NATIONWIDE INSURANCE COMPANY ("NATIONWIDE") BECAUSE THERE ARE DISPUTED ISSUES OF FACT THAT MUST BE DETERMINED BY A JURY."

{¶ 20} Beard argues that there are genuine issues of material fact concerning whether the agreement was properly cancelled, and whether the deductions made by Nationwide from Beard's accumulated assets were proper. Beard argues that the term "notice" in the cancellation section of the agreement is ambiguous, and its proper construction should have been considered a genuine issue of material fact for a jury to decide.

A. Beard's Argument that Cause Was Required for Cancellation

{¶ 21} The Supreme Court of Ohio has held that, "[i]f a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322. Furthermore, common terms are often not defined in a contract, but are subject to their plain and ordinary meaning. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d 107, 108, 1995-Ohio-214.

{¶ 22} In a similar case, the Supreme Court of Ohio held that the intent of the parties to the contract should be the foremost consideration when construing clauses in the contract.

*Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.,* 86 Ohio St.3d 270, 273, 1999-Ohio-162. The Court also held that courts should not read ambiguity into a clause where there is none. Id. In *Hamilton*, the phrase at issue was "with or without cause," where that specific term was used in the contractual agreement. *Id*.

{¶ 23} Beard argues that the term "written notice" is ambiguous in its meaning. Beard suggests that "written notice" could mean that termination will only be effective if cause is specified, and asks rhetorically what Beard was to be given notice of, if not notice of the cause for the cancellation of the agreement.

{¶ 24} The sentence in the cancellation clause of the agreement in which the term "written notice" is contained reads as follows: "Further, due to the personal nature of our relationship[,] you or the Companies have the right to cancel this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address." The plain meaning of this sentence is that either party can cancel the contract with notice to the other, no reason being required for the cancellation. As to the term "written notice," it is unambiguous as to its meaning. "Notice" is a common term in legal language. Perhaps the best definition appears in the Ohio Uniform Commercial Code, Title 13 Chapter 1301.01(Y):

{¶ 25} "A person has 'notice' of a fact when any of the following applies:

{¶ 26} "(1) The person has actual knowledge of it.

{¶ 27} "(2) The person has received a notice or notification of it.

{¶ 28} "(3) From all the facts and circumstances known to the person at the time in question, the person has reason to know that it exists."

{¶ 29} In the context of the cancellation provision, it is clear that the notice required is

notice to one party of cancellation of the agreement by the other party. This is a common provision in ongoing contracts without a specified duration – employment contracts and leases, for example – and is intended to let the non-cancelling party know of the fact that the contract is going to come to an end, so that the non-cancelling party may make alternative arrangements.

{¶ 30} Beard argues that because the letter, personally given to Beard by Watters putting Beard on notice of cancellation, contains reasons for the cancellation, Nationwide must have construed the contract as requiring good cause for its termination. Beard asks in his reply brief, "Why else would Nationwide state its reasons for canceling?" Common courtesy immediately comes to mind; the parties had been in a business relationship for fifteen years. The letter expressly notes that cause is not required for termination of the agreement. We find nothing in the letter notifying Beard of the cancellation of his agency contract that a reasonable finder of fact could conclude as impeaching the clear, unambiguous provision in the agreement that it is subject to cancellation by either party, subject only to the requirement of the giving of notice.

B. Beard's Challenge to the Amounts Offset from Monies Nationwide Owed Him

{¶ 31} Beard also argues that the propriety of the amount of money withheld by Nationwide to recoup the funds that were missing from the remittance accounts is a genuine issue of material fact, and should be considered by a jury. Beard argues that no audit was conducted on the accounts, so there is no way of determining what sum was actually missing. Beard further argues that the taking of assets by Nationwide is unjust. Beard formulates his argument that upon cancellation of the agreement all benefits and detriments are cut off.

Under this logic, Nationwide is not entitled to withhold any money to make up for the funds that were missing from the remittance accounts, but Beard is nevertheless entitled to all commissions and extended earnings.

{¶ 32} In addition, Beard contends that Nationwide should not have been granted summary judgment, because Nationwide took money to which Beard was entitled. Beard argues that Nationwide took, or more appropriately withheld, compensation in the form of commission payments and money from his extended earnings and deferred compensation accounts, in the amount of $126,564.91.

{¶ 33} Upon filing the motion for summary judgment, Nationwide presented the following evidence: Beard's deposition; the signed Agent Agreement; the notice cancelling the agreement; Beard's agency premium audit report from August 2008; e-mail stemming from the August audit concerning remittance account inaccuracies; November 2008 e-mail from Nationwide Internal Investigations Unit, which set a meeting about the remittance accounts; notice of agency remittance account NSF from September 2008; Beard's extended earnings and retirement plan documents; the Affidavit of Shawn Patterson, who verified the documentary evidence; e-mail warnings about unremitted funds; logs of unremitted premiums; internal communications; and documents relating to the processing of Beard's unremitted premiums. This evidence reveals four instances in which Beard was found to have owed money to Nationwide.

{¶ 34} The first instance involves $14,060.78 owed to Allied, a Nationwide subsidiary. This sum was calculated from records of funds that were not remitted before the agreement was cancelled. To recoup the money, Nationwide exercised its contractual right of

having a first lien on all funds due to Beard. Accordingly, Nationwide deducted $11,320.78 from commissions paid to Beard in November 2008, and $2,740.00 from commissions paid in December 2008.

{¶ 35} Among other things, Beard contends the money owed to Allied was taken twice, but that is not correct. In support of this contention, Beard points to Exhibit 7 attached to Beard's Memorandum in Opposition to Summary Judgment. See Beard Appellate Brief, pp. 2-3, referring to Exhibit 7. However, the document in Exhibit 7 does not contain evidence of money being deducted from Beard's accounts. Instead, Exhibit 7 contains a copy of a check Nationwide issued to Allied in the amount of $14,060.78, in payment of under-remits for Beard. This is the amount that Nationwide previously deducted from Beard's commissions, and is simply evidence of Nationwide's payment of the amount to Allied. Thus, no evidence was submitted indicating that Beard was charged twice for the payments to Allied.

{¶ 36} The second instance involves $17,729.87 owed to Nationwide for unremitted payments not discovered until after the agreement was terminated. In support of summary judgment, Nationwide provided emails notifying Beard of the unremitted amounts, as well as internal logs detailing customer complaints and the status of premium payments that were made. See Exhibit 9B of Nationwide's Motion for Summary Judgment and Exhibit B attached to Nationwide's Reply in Support of Summary Judgment.

{¶ 37} Beard argues that these funds were never owed to Nationwide and even states in his affidavit that he was never late with remittance payments. Beard's affidavit contradicts his prior deposition, in which he testified that Beard let the "girls" in his office handle all of

the remittance payments, deposits and paperwork. December 21, 2009 Deposition of Richard Beard, pp. 86-87. Beard also testified that he failed to keep a close eye on the remittance account, due to surgeries he and his wife had undergone, and the amount of work he had missed. Id. at p. 90, and Exhibit D attached to Beard's deposition.

{¶ 38} Beard did testify that he received notices of shortfalls and that the situation was resolved by "going back and forth several times with each other talking via phone." Id. at p. 92. Beard did not submit any evidence, however, to substantiate his conclusory assertion that the situation had been resolved to Nationwide's satisfaction.

{¶ 39} The Supreme Court of Ohio has stressed that "an affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment." Byrd v. Smith, 110 Ohio St.3d 24, 30, 2006-Ohio-3455, ¶ 28. Beard failed to offer any explanation for contradicting his prior deposition, and his affidavit does not raise a genuine issue of material fact about the unremitted premiums.

{¶ 40} The third instance of deduction involves $1,164.04 owed to Titan Insurance, another Nationwide Subsidiary, for funds that Beard failed to remit. Nationwide documented the lack of payments, and also provided Beard with notice that it was reimbursing Titan. See Exhibit C attached to Nationwide's Reply in Support of Summary Judgment. Beard did not offer documents challenging this amount.

{¶ 41} The final instance involves $597.00 needed for a refund to a customer, Mark S., who paid Beard a premium, but did not receive a policy of insurance. When Mark's mortgage company realized no policy existed, Mark S. had to pay for hazard insurance.

Nationwide then refunded the money to Mark S., and charged Beard for the payment. Nationwide provided internal logs and a request for the reimbursement check to be issued. Beard failed to submit any evidence regarding this item.

{¶ 42} By the time the latter three items, totaling $19, 490.87, were discovered, Nationwide had already issued its final commission paycheck to Beard. In order to recoup these particular shortages, Nationwide used its contractual lien rights, seizing Beard's monthly extended earnings payments. Between March 2009, and December 2009, Nationwide recouped $1,800.16 each month. This sum totaled $18,001.60 (10 months times $1,800.16). The final amount ($1,489.31) was withheld in January 2010. These withholdings equal $19,490.91, and are within a few cents of the sum owed.

{¶ 43} Beard also argued that Nationwide improperly withheld $3,600.32, but by Beard's own admission, this money was actually paid to the Internal Revenue Service for IRS liens. See Beard Deposition, p. 148.[1]

{¶ 44} The parties agree that since the last sum was taken from Beard's extended earnings in January 2010, Nationwide has not taken further funds. The total documented amount taken, including amounts taken before and after termination of the agreement, is $33,551.69.

{¶ 45} In opposing summary judgment, Beard submitted his own affidavit, in which he averred that he had no knowledge of why the funds were taken. Beard did attach two exhibits to the affidavit, and averred that he is owed a total of $6,381.58 for commissions that

---

[1] Beard's attorney stated in the deposition that the IRS had said the money should not have been paid to the IRS, but no documentary evidence was ever submitted to establish this fact. See Beard deposition, p. 149.

he had earned.   See Beard Affidavit, ¶¶ 27 and 28, and Plaintiff's Exhibits 10 and 12 (respectively, Nationwide documents reflecting premium payments made to Beard's account between December 15 and December 28, 2008, and Nationwide Compensation Statements, dated January 15, 2009).

{¶ 46} Nationwide contends that Beard is not entitled to any further sums, because the Agreement and Conditions provide that Beard was not entitled to any commission payments after December 2008.   Nationwide Brief, p. 18.

{¶ 47} As an initial point, we note that the paychecks provided by Nationwide are made  in arrears.   For example, the check dated December 15, 2008, is for a "Pay Begin Date" of November 12, 2008, and a "Pay End Date" of November 24, 2008.   Thus, the commissions covered by that paycheck would appear to be those earned between November 12 and November 24, 2008.   Similarly, the December 31, 2008 paycheck, which is the last check Nationwide offered as proof of payment to Beard, covers a "Pay Begin Date" of November 25, 2008 and a "Pay End Date" of December 12, 2008.   See Exhibit 9(C) attached to Nationwide's Motion for Summary Judgment.

{¶ 48} Even if the paychecks were not in arrears, the paycheck issued on December 31, 2008, does not, and could not, account for premium commissions earned from December 12, 2008, through December 15, 2008, which was the date of cancellation.   It would also obviously not account for premiums paid after the termination date of December 15, 2008.

{¶ 49} The Agent's Agreement provides the following statement about compensation:

{¶ 50} "7.  **Compensation**.   Any compensation due you under the Agreement from any of the Companies, may be paid, to you, on their behalf, by any of the other Companies.

For all services rendered under this Agreement by you, you shall be compensated solely in accordance with the General Conditions and Schedules of each Company attached hereto and made a part hereof except for such additional compensation payable to you under paragraph 11." Ex. 2 Attached to Nationwide's Motion for Summary Judgment, p. 2.

{¶ 51} Paragraph 11 refers to extended earnings and DCIC, and does not apply to the current discussion. The Agent Agreement does not contain any further comments on the subject, other than to state in Paragraph 9 that the agreement "shall automatically cancel on the date your license to act as an agent for the Companies is revoked or cancelled, or upon death."

{¶ 52} A document entitled "General Conditions Applicable to All Attached Schedules" was attached to Nationwide's Motion for Summary Judgment as Exhibit 9(D). Paragraph 8 of that document states as follows:

{¶ 53} "Upon cancellation of your Agreement, all compensation provided in these Schedules shall immediately cease except as stated below:

{¶ 54} "a.   Original commissions on Life and Health Business shall be paid in accordance with the schedules as if no cancellation has occurred.

{¶ 55} "b.   If your Agreement is cancelled on any date from the first through the fifteenth day of the month, all original commission and renewal service fees which would otherwise be paid to you during the month of cancellation shall be paid to you. If your agreement is canceled from the sixteenth through the last day of the month, all original commission and renewal service fees which would otherwise have been paid to you through the fifteenth of the succeeding month will be paid to you."

{¶ 56} The General Conditions state that original compensation is earned on the date a

new policy is issued and will be paid within 30 days.  Id. at ¶ 2 (a).  Regarding Renewal Service Fees, the General Conditions similarly provide that:

{¶ 57} "3.  Renewal Service Fees will be earned by you, for those policies recorded in your name on the records of the Companies, on the date the policy renews.  Renewal Service Fees earned by you shall be paid according to the following schedule:

{¶ 58} "a.  Renewal Service Fees earned on policies that renew in any of the Companies * * * with the exception of Nationwide Life Insurance Company will be paid to you within thirty (30) days of when it is earned."

{¶ 59} The agreement in the case before us was cancelled on December 15, so Beard would be entitled to all original and renewal fees that would otherwise have been paid in the month of December 2008.  According to the evidence presented, commissions were paid on December 15, 2008, December 31, 2008, and January 15, 2008.  The December 31, 2008 payment is for a time beginning November 25, 2008, and ending on December 12, 2008.  Nationwide takes the position that under the General Conditions, Beard received everything to which he was entitled, because the commissions Beard earned would not have been paid until January 15, 2008.

{¶ 60} Nationwide's own documents indicate that Beard earned forty-four commissions between December 13 and December 15, 2008, on policies that were either new or were renewed between those dates.  See Exhibit 12 (Nationwide Insurance Property & Casualty Compensation Statement Pay Date January 15, 2009), pp. 1, 3, 5, 7, 9, 11, and 12.  For example, Policy No. FPKNMPN66302805, a renewal policy, had an effective date of December 14, 2008.  The premium was $1,851, and the renewal commission was $222.12.

Likewise, Policy No. ACP CPPK5712912707, a renewal policy, had an effective date of December 14, 2008. The premium for that policy was $2,780, and the renewal commission was $389.20.

{¶ 61} The General Conditions provide an outer payment requirement of new and renewal fees *within* 30 days, but this does not preclude payment from being made earlier. We conclude that the provisions for payment upon cancellation in the General Conditions are ambiguous. Paragraph 8(b) states that "If your Agreement is cancelled on any date from the first through the fifteenth day of the month, all original commission and renewal service fees which would otherwise be paid to you during the month of cancellation shall be paid to you."

{¶ 62} One could argue that there may have been a course of conduct under the Agreement and Conditions, pursuant to which Nationwide paid only at the outer limit of the 30-day period, and thus, Beard would not have been entitled to any commissions for fees on December 13, 14, and 15, 2008, because these were not fees that "would otherwise have been paid" in December 2008. However, Nationwide failed to present evidence to this effect.

{¶ 63} We are also troubled by the fact that Nationwide wishes to construe the contract strictly when it is to Nationwide's benefit, while not strictly following the contract when that would have been to Beard's advantage. For example, we note that Nationwide's commission payment on January 15, 2009, would not have been within the required time period (thirty days) after the forty-four commissions were earned on December 13, 14, and 15, 2008. These commissions could only have properly been paid, under the existing schedule of paychecks, by December 31, 2008. We conclude that because of these factual issues, the trial court erred in rendering summary judgment in favor of Nationwide in the amount that it did.

**{¶ 64}** In his brief, Beard also contends that Nationwide improperly deducted $49,920.97 from his retirement account and $19,049.57 from his deferred compensation account on March 31, 2009. These sums total $68,970.44. The trial court rejected this contention, concluding that the latter two amounts had to do with NFCU, not Nationwide Insurance Company. The trial court also noted that Beard's loans from NFCU were repaid in full on March 31, 2009.

**{¶ 65}** NFCU is not a party to the litigation. In the amended complaint, Beard alleged that Nationwide had colluded with NFCU by transferring or selling Beard's "book" to another agent, and failing to credit sums received to Beard's account. Beard attached documents to the complaint, which indicated that he had signed credit and promissory note agreements with NFCU in 2002 and 2003. In his deposition, which was taken in December 2009, Beard indicated that he had taken out loans to purchase the right to the "books" of his father, and of another agent, Thomas Smith, who had unexpectedly passed away.

**{¶ 66}** In this situation, one alternative is that Nationwide will pay an agent a service fee, not a commission, to handle the accounts. Deposition of Lawson Nickol, pp. 25-28. If an agent wishes to receive commissions and retain the accounts, however, the agent must purchase the "book" of the prior agent. In order to purchase the books, Beard signed notes in the amounts of $77,051.67 and $108,883.28. Under the notes, Beard was the borrower and NFCU was the obligee. Beard agreed in the note that upon termination of his agent's agreement with Nationwide, the entire amount of the loan balance, plus all accrued interest and payments, would become immediately due and payable to the payee. In addition, both notes state that:

**{¶ 67}** "Borrower hereby transfers and assigns to payee any and all payments due borrower under borrower's agent's agreement or any agreement executed hereafter with Nationwide for the purpose of satisfying the loan. This assignment of collateral shall include all commissions, extended earnings, deferred compensation incentive credits, bonuses (including post-conversion bonuses and contingency bonuses), and any other compensation due Borrower from Nationwide under the Agent's Agreement, now or at any time hereafter, and upon the termination of the Borrower's Agent's Agreement, such amounts due the Agent shall first be applied in their entirety to any outstanding indebtedness owed to the Payee in connection with the Loan, provided however that this requirement shall not entitle Borrower to such Collateral if Borrower defaults on such Agent's Agreement and loses its rights to such Collateral. **If Borrower's Agent's Agreement with Nationwide is terminated for any reason and a new Agent's Agreement is not promptly entered into between Nationwide and Borrower, Borrower agrees that any and all amounts due from Nationwide of any nature whatsoever, whether constituting Collateral (as hereinafter defined) or not, shall first be paid to NFCU to satisfy in full any amounts due and owing under this Loan before Borrower shall be entitle to receive any remaining proceeds**."  Credit Agreement and Promissory Note, pp. 2-3   (bolding in original).

**{¶ 68}** On its face, the note allows deduction of outstanding amounts from Beard's extended earnings or deferred compensation, upon termination of the agent's agreement.  In his deposition, taken in December 2009, Beard stated that the NFCU loans had been paid off in March 2009, and that he had received notification that the new agent would be Jerry Poff. Beard said he believed the loans were to be paid off by the sale of the book of business to

Poff, but he had not received an accounting on the sale. Subsequently, in September 2010, when replying to summary judgment, Beard stated in an affidavit that Nationwide had deducted the remaining loan amounts ($49,920.97 and $19,949.57) from his retirement and deferred compensation accounts. Beard Affidavit, ¶s 29 and 30. Beard referenced exhibits for these statements, but failed to include either the exhibit number or the exhibit itself.

**{¶ 69}** Assuming, for the sake of argument, that Nationwide did deduct the sums from Beard's accounts, Beard failed to raise any genuine issues of material fact about the propriety of those deductions. In the promissory note, Beard specifically gave NFCU the right to obtain payment from any of his accounts upon termination of the agreement. Although the trial court's reasoning was partially erroneous, in that a claim "could" have been brought against Nationwide for improperly releasing funds to NFCU, the court ultimately came to the correct conclusion when it concluded that no impropriety occurred. Accordingly, the trial court did not err in rendering summary judgment in Nationwide's favor on this point.

**{¶ 70}** Because genuine issues of material fact exist regarding Beard's commission for original and renewal premiums in December 2008, the trial court erred in rending summary judgment in favor of Nationwide.

**{¶ 71}** Beard's sole assignment of error is sustained.

III

**{¶ 72}** As a final matter, we note that Nationwide filed a motion in January 2011, for leave to file a surreply instanter. Nationwide alleged various misstatements and arguments that were not raised below. The motion is denied, because the record before the court is sufficient to determine what arguments were raised below. Beard also filed a motion in

January, to correct the record and to "beg for fair treatment." Beard's motion is granted in part. The records of the court will be corrected to reflect the correct address of Beard's counsel. The remainder of the motion is denied; this court intends to honor its obligation to treat all litigants fairly – no special request to do so is needed.

IV

{¶ 73} Beard's sole assignment of error having been sustained in part, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

Alfred J. Weisbrod
James P. Schuck
Robert J. Thumann
Hon. Robert J. Lindeman